1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ELIZABETH C. ANDULAN; ARRIZ C.
ANDULAN,

                    Plaintiff,

        v.

CITY OF SEATTLE; SGT. JAMES K.
DYMENT; SGT. LARRY W.
BROTHERTON,

                    Defendants.

CASE NO. C07-500RBL

ORDER DENYING
PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY
JUDGMENT AND GRANTING
IN PART AND DENYING IN
PART DEFENDANTS'
COUNTERMOTION

    This matter comes before the Court on Plaintiffs' Motion for Partial Summary

Judgment (Dkt. 17) and Defendants' countermotion (Dkt. 19). The Court has considered

the pleadings filed in support of and in opposition to the motions and the remainder of the

file, considers these matters suitable for disposition without oral argument, and hereby

denies Plaintiffs' motion and grants in part and denies in part Defendants' countermotion

for the reasons stated herein.

## I. FACTUAL AND PROCEDURAL BACKGROUND

    On April 4, 2007, Plaintiffs filed suit in federal court asserting that Defendants

violated their rights under the Fourth Amendment to the United States Constitution. Dkt.

12 at 1. Plaintiffs Elizabeth C. Andulan and Arriz C. Andulan are siblings residing in a

house at 7734 36th Ave NE in Seattle, Washington. Dkt. 1 at 2. Plaintiffs' claims concern

ORDER - 1

1  the execution of a search warrant in June of 2005. Except where otherwise indicated, the
2  following facts are undisputed:

3      Defendant Sergeant James K. Dyment had received several complaints that there
4  was a strong odor of marijuana in the 7700 block of 36th Avenue NE in the Seattle,
5  Washington area. Dkt. 21 at 2. On June 9, 2005, Sergeant Dyment was on duty and
6  working in the area when he detected a heavy marijuana odor. *Id.* He also noticed a
7  bluish light coming from inside of the Andulan residence. *Id.* Sergeant Dyment concluded
8  that the light was identical to the lights typically used in marijuana grow operations. *Id.*

9      On June 10, 2005, Sergeant Dyment returned to the Andulan residence and again
10 smelled marijuana. *Id.* According to Sergeant Dyment, the smell was particularly strong.
11 *Id.* ("The odor of marijuana was again very strong - stronger than I have ever smelled in
12 an exterior sniff."). Sergeant Dyment also noticed humidity in the windows, which
13 Sergeant Dyment contends is typically associated with marijuana grow operations
14 containing a "large amount of foliage." *Id.*

15     Based upon his observations, Sergeant Dyment applied for and received a warrant
16 to conduct an exterior sniff using Seattle Police Narcotics Detection Canines. *Id.* at 3;
17 Dkt. 21, Exh. 1 at 14 (affidavit); Dkt. 21, Exh. 2 at 17 (warrant). Pursuant to that warrant,
18 Seattle Police Officers Drury and Volluz and Seattle Police Narcotics Detection Canines
19 "Scar" and "Duke" examined the exterior of the Andulan residence on June 13, 2005.
20 Dkt. 20 at 2. Scar gave a "positive sit response," indicating the presence narcotics odors
21 coming from the Andulan residence. *Id.* Duke also examined the exterior of the Andulan
22 residence and gave a positive sit response at the Andulan residence. Dkt. 21 at 3.

23     Based upon the results of the narcotics detection canines, the Seattle Police
24 Department applied for and received a search warrant from King County District Court to
25 search the interior of the Andulan residence. Dkt. 20 at 2. Prior to executing the search
26 warrant, Seattle police officers participated in a briefing, reviewed the plan for entry and
27 execution of the warrant, and rehearsed the plan of entry. *Id.* at 3. The execution of the

28

ORDER - 2

search warrant was planned in advance, and the plan was memorialized in the Seattle Police Department North A.C.T. Search Warrant Operations Order. Dkt. 21 at 4. The order lists the criminal history of Plaintiffs as "unknown." Dkt. 18-2, Exh. 1 at 8. The order reflects the decision to conduct a "dynamic" entry as opposed to a "slow and deliberate" entry. *Id.* The selected method of entry was through use of a ram and a halligan. *Id.*

The search warrant served on June 14, 2005, at 11:15 or 11:20 p.m. Dkt. 20 at 2; Dkt. 18-2, Exh. 4 at 32; Dkt. 18-3, Exh. 7 at 19. Sergeant Dyment was the team leader during the execution of the warrant. Dkt. 21 at 4. Defendant Sergeant Larry W. Brotherton was the assistant team leader. Dkt. 29, Exh. 1 at 7-8.

After arriving at the Andulan residence, the officers parked and went to their assigned positions. Sergeant Dyment then began what is known as a "squeeze up," which is a method of determining that the officers are ready and that everything is in order to begin.[1] Dkt. 20 at 3.

When the officers arrived, Mr. Andulan was in his bedroom, and Ms. Andulan was in her bedroom. Dkt. 18-2, Exh. 4 at 32; Dkt. 18-3, Exh. 7 at 19. Both Plaintiffs heard sounds coming from the doorway. Dkt. 18-2, Exh. 4 at 32; Dkt. 18-3, Exh. 7 at 19. Mr. Andulan thought that neighborhood kids were running on the stairs and went to the door to determine the cause of the noise. Dkt. 18-2, Exh. 4 at 33.

After the squeeze up, Officer McLashan knocked on the door of the Andulan residence and shouted, "Seattle Police with a search warrant. Open the door." Dkt. 21 at 6; *but see* Dkt. 18-2, Exh. 4 at 33 (While at the door, Mr. Andulan heard, "Police! Open the door." ). There is a dispute concerning how much time elapsed before officers entered. The officers contend that they waited approximately ten seconds, perhaps more, before Sergeant Dyment ordered the other officers to enter. Dkt. 20 at 4; Dkt. 21 at 6. Mr.

---

[1] A squeeze up begins when the team leader, who is located behind the other officers and is charged with determining whether or when to squeeze up, squeezes the arm of the officer in front of him or her. This initial squeeze begins a chain of squeezing from officer to officer until all officers have been squeezed. Dkt. 20 at 3.

1  Andulan contends that two seconds, at most, elapsed between the time when the police

2  officers announced their presence and when they breached the door. Dkt. 27 at 2. Mr.

3  Andulan contends that as he unlatched the door, police officers came through the door

4  using a breaching tool. Dkt. 18-2, Exh. 4 at 33; Dkt. 20 at 4.

5      The officers shouted, "Police! Get down!" Dkt. 21 at 7. Mr. Andulan scrambled

6  backwards up the stairs, and the officers told him to lie face down on the floor and put his

7  hands out. Dkt. 18-2, Exh. 4 at 33. One of the officers grabbed Mr. Andulan's right

8  shoulder, flipped him over, and dragged him across the floor. *Id.* Another officer pointed

9  his gun and flashlight in Mr. Andulan's face as he was dragged into the living room. *Id.*

10 In the process of being dragged, Mr. Andulan's sweat pants and underpants were pulled

11 down. *Id.* The officer rolled Mr. Andulan onto his stomach and put his knee in Mr.

12 Andulan's back, pinning him to the floor. *Id.* Mr. Andulan was ordered to put his hands

13 behind his back but could not comply because he was pinned to the floor with an officer's

14 knee.

15     Sergeant Dyment contends that when he entered the home, Mr. Andulan was

16 already laying on his stomach on the stairs to the upper floor and was under the control of

17 other officers. Dkt. 21 at 9. Sergeant Dyment contends that he did not speak to Mr.

18 Andulan or point his weapon at Mr. Andulan. *Id.* Sergeant Dyment contends that he did

19 not engage in any activity that resulted in the removal of Mr. Andulan's pants. *Id.* at 10.

20 Sergeant Dyment contends that he never saw Mr. Andulan with his pants down. *Id.*

21     Ms. Andulan was upstairs when the police arrived and first saw the officers, guns

22 drawn, once they reached the upstairs area of the house. Dkt. 18-3, Exh. 7 at 19.

23 Confused, Ms. Andulan began to walk down the hall. *Id.* The officers told Ms. Andulan

24 to crawl towards them and warned that they would shoot her if she failed to do so. *Id.* at

25 20; Dkt. 21 at 9 (Sergeant Dyment heard an officer state, "Suspect down at the end of the

26 hall, get on your hands and knees and crawl toward my voice."). Sergeant Dyment

27 contends that he did not speak to Ms. Andulan or point his weapon at her. Dkt. 21 at 9.

28

1     After a while, the officers told Ms. Andulan to lie on her stomach next to Mr.

2  Andulan. Dkt. 18-2, Exh. 4 at 33. Ms. Andulan complied, and Plaintiffs were handcuffed.

3  *Id.*; Dkt. 20 at 4. One of the officers continued to point a gun at Plaintiffs after they were

4  handcuffed. Dkt. 18-2, Exh. 4 at 33.

5     Sergeant Dyment contends that he first made contact with Plaintiffs at this point in

6  time. *See* Dkt. 21 at 9. Sergeant Dyment contends that he told Plaintiffs that he had a

7  search warrant and that officers were going to conduct a search of the residence. *Id.*

8     The officers then moved Plaintiffs to the couch and removed the handcuffs. Dkt.

9  18-2, Exh. 4 at 33.  Plaintiffs were given a copy of the search warrant and, upon Mr.

10  Andulan's request, shown a business card and police identification. Mr. Andulan asked

11  Sergeant Dyment whether he had checked the history of the house and its owners.

12  Sergeant Dyment told Mr. Andulan that he had done background checks and found

13  nothing suspicious.

14     Mr. Andulan and Detective Chinn walked through the house and around the

15  premises to assess the damage to the house. Upstairs, a closet door had been removed.

16  Downstairs, the front door was splintered and cracked, and the deadbolt and surrounding

17  wood were no longer secured. *Id.* at 34. In addition, a light cover on Plaintiffs' car and a

18  vinyl wardrobe were broken. *Id.*

19     Defendant Dyment then told Plaintiffs that they had made a mistake. *Id.* The

20  officers ultimately found no evidence of marijuana or its cultivation. The other officers

21  continued to hold Plaintiffs. One of the officers asked Ms. Andulan to sign a form stating

22  that nothing was taken from the home. *See* Dkt. 18-3, Exh. 8 at 40.

23     Plaintiffs contend that as a result of these events, they have sought medical care

24  and moved to a new residence. Dkt. 1 at 4. Plaintiffs further contend that the City of

25  Seattle has a policy and custom of executing search warrants in this manner and that these

26  events amount to a violation of the Fourth Amendment. *Id.* at 5.

27

28

ORDER - 5

1    On January 9, 2008, Plaintiffs moved for partial summary judgment to strike the

2 qualified immunity defense of Sergeants Dyment and Brotherton. Dkt. 17. The motion

3 was originally noted for consideration on February 1, 2008. In their response, Defendants

4 included a countermotion on the qualified immunity issue. Dkt. 19. To allow Plaintiffs a

5 sufficient opportunity to respond to the countermotion, the Court renoted the

6 countermotion for consideration on February 15, 2008. Dkt. 23. The Court also renoted

7 Plaintiffs' motion so that the two motions could be considered concurrently. *Id.* Both

8 motions have been fully briefed and are ripe for consideration.

9                              **II.  SUMMARY JUDGMENT STANDARD**

10    Summary judgment is proper only if the pleadings, depositions, answers to

11 interrogatories, and admissions on file, together with the affidavits, if any, show that there

12 is no genuine issue as to any material fact and the moving party is entitled to judgment as

13 a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a

14 matter of law when the nonmoving party fails to make a sufficient showing on an

15 essential element of a claim in the case on which the nonmoving party has the burden of

16 proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of

17 fact for trial where the record, taken as a whole, could not lead a rational trier of fact to

18 find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

19 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative

20 evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e).

21 Conversely, a genuine dispute over a material fact exists if there is sufficient evidence

22 supporting the claimed factual dispute, requiring a judge or jury to resolve the differing

23 versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W.*

24 *Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

25    The determination of the existence of a material fact is often a close question. The

26 Court must consider the substantive evidentiary burden that the nonmoving party must

27 meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

28

1   U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual

2   issues of controversy in favor of the nonmoving party only when the facts specifically

3   attested by that party contradict facts specifically attested by the moving party. The

4   nonmoving party may not merely state that it will discredit the moving party's evidence at

5   trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec.*

6   *Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, nonspecific

7   statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan*

8   *v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

9                                     **III. DISCUSSION**

10  **A.     QUALIFIED IMMUNITY STANDARD**

11          Government officials who are sued in their official capacities have qualified

12  immunity from suit absent evidence of incompetence or knowing violation of the law. *See*

13  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). This rule shields government officials

14  from suit in order to afford relief to plaintiffs without unduly hindering officials'

15  performance of their governmental duties. *Id*. Qualified immunity is not merely a defense

16  to liability; it is an entitlement to immunity from suit in the first place. *See Devereaux v.*

17  *Perez*, 218 F.3d 1045, 1052 (9th Cir. 2000), *reh'g en banc*, *Devereaux v. Abbey*, 263

18  F.3d 1070 (9th Cir. 2001).

19          The defense of qualified immunity has three steps. First, there must be a violation

20  of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). At this stage, the

21  facts are viewed in the light most favorable to the injured party. *Id*. Absent such a

22  violation, there is no need to pursue the remaining qualified immunity analysis. *Id*.

23          Second, the right must be so clearly established that a reasonable officer would be

24  on notice of its existence and parameters. *Id.* at 199; *Romero v. Kitsap County*, 931 F.2d

25  624, 627 (9th Cir. 1991). This burden rests with the plaintiff. *Romero*, 931 F.2d at 627.

26  The plaintiff may establish that the conduct at issue was previously held unlawful or that

27  the unlawfulness is apparent. *See Anderson*, 483 U.S. at 640.

28

1    Third, the officer must demonstrate that a reasonable officer could have believed

2   that the conduct was lawful. *See Romero*, 931 F.2d at 627. Qualified immunity is

3   "designed to spare a defendant not only of unwarranted liability, but unwarranted

4   demands customarily imposed upon those defending a long drawn-out lawsuit."

5   *Devereaux*, 218 F.3d at 1052.

6   **B.    42 U.S.C. § 1983**

7    Section 1983 is a procedural device for enforcing constitutional provisions and

8   federal statutes; the section does not create or afford substantive rights. *Crumpton v.*

9   *Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). In order to state a claim under 42 U.S.C. §

10   1983, plaintiffs must demonstrate that (l) the conduct complained of was committed by a

11   person acting under color of state law and that (2) the conduct deprived a person of a

12   right, privilege, or immunity secured by the Constitution or by the laws of the United

13   States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by*

14   *Daniels v. Williams,* 474 U.S. 327 (1986). Section 1983 is the appropriate remedy only if

15   both elements are satisfied. *Haygood v. Younger,* 769 F.2d 1350, 1354 (9th Cir. 1985). In

16   addition, plaintiffs must allege facts demonstrating that individual defendants caused, or

17   personally participated in causing, the alleged harm. *Arnold v. IBM*, 637 F.2d 1350, 1355

18   (9th Cir. 1981). A defendant cannot be held liable under 42 U.S.C. § 1983 solely on the

19   basis of supervisory responsibility or position. *Monell v. New York City Dept. of Social*

20   *Services*, 436 U.S. 658, 694 n.58 (1978).

21   **C.    FOURTH AMENDMENT**

22    The Fourth Amendment guarantees citizens the right "to be secure in their persons,

23   houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const.

24   amend. IV. Plaintiffs contend that Sergeants Dyment and Brotherton's entry was

25   unreasonable because the officers waited an insufficient amount of time after knocking

26   before entering the residence by force, that the officers' means of entry caused

27

28

1   unnecessary damage to the Andulan residence, and that the officers' use of force in

2   detaining Plaintiffs during the search was excessive.

3       **1.      Reasonableness of Entry**

4           The Supreme Court has held that "although a search or seizure of a dwelling might

5   be constitutionally defective if police officers enter without prior announcement, law

6   enforcement interests may also establish the reasonableness of an unannounced entry."

7   *Wilson v. Arkansas*, 514 U.S. 927, 938 (1995). For example, an unannounced entry may

8   be reasonable in the presence of threats of physical violence or when police officers have

9   reason to suspect that evidence would be destroyed if the entry were announced. *See id.*

10  at 936. Circumstances justifying an unannounced entry may be known prior to execution

11  and service of the warrant, or an exigency may ripen after the police arrive. *See United*

12  *States v. Banks*, 540 U.S. 31, 38 (2003).

13          The Fourth Amendment's reasonableness requirement cannot be dispensed with

14  categorically. The role of the reviewing court is to analyze whether the facts and

15  circumstances of the particular case before it justified an unannounced entry. *Richards v.*

16  *Wisconsin*, 520 U.S. 385, 394 (1997). More specifically, "the police must have a

17  reasonable suspicion that knocking and announcing their presence, under the particular

18  circumstances, would be dangerous or futile, or that it would inhibit the effective

19  investigation of the crime." *Id.* at 1219. While felony drug investigations frequently

20  involve threats of physical violence or the risk that evidence will be destroyed if police

21  give advance warning of their presence, courts must evaluate the manner in which search

22  warrants are executed on a case-by-case basis. *Richards*, 520 U.S. at 391; *United States*

23  *v. Granville*, 222 F.3d 1214, 1219 (9th Cir. 2000) ("generalized fears about how drug

24  dealers usually act or the weapons that they usually keep is not enough to establish

25  exigency."). For example, there is no exigency when police officers knew in advance

26  "that the drugs being searched for were of a type or in a location that made them

27  impossible to destroy quickly." *Richards*, 520 U.S. at 393.

28

ORDER - 9

Implied in the knock-and-announce requirement is a requirement that police officers allow a reasonable amount of time to elapse between the announcement and the entry:

> One point in making an officer knock and announce, then, is to give a person inside the chance to save his door. That is why, in the case with no reason to suspect an immediate risk of frustration or futility in waiting at all, the reasonable wait time may well be longer when police make a forced entry, since they ought to be more certain the occupant has had time to answer the door.

*Banks*, 540 U.S. at 41.

The Supreme Court treats reasonableness under the Fourth Amendment as "a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case." *Id.* at 36. Accordingly, there is no bright line rule for how long police officers must wait. To determine what is reasonable, courts consider what was known to the police officers at the time. *Id.* 39.

For example, the defendant in *Granville* was suspected of being involved in criminal drug trafficking organization that had a known history of violence. Police concluded that even though Granville had no criminal history involving firearms, it was probable that firearms would be found. *Granville*, 222 F.3d at 1216. The police officers in *Granville* knocked on the door, announced their presence, and waited five seconds before entering. *Id.* at 1217. The Supreme Court held that while a refusal to comply with a request for entry can be inferred from silence, a significant amount of time must pass before officers may forcibly enter a residence. *Id.* at 1218. In *Granville*, the Supreme Court noted that the warrant was executed in the early morning, when residents would likely be sleeping, and concluded that five seconds was an insufficient amount of time for Granville to determine who was at the door and comply with the request for entry. *Id.*

In *Banks*, the officers waited 15-20 seconds before using a battering ram to gain entry and execute a warrant to search for cocaine. *Banks*, 540 U.S. at 33. The Supreme Court noted both the timing and subject of the search. Importantly, police arrived during

the day, when residents were more likely to be awake and active. *Id.* at 40. Also, the case involved "cocaine, which a prudent dealer will keep near a commode or kitchen sink." *Id.* at 40. The Supreme Court in *Banks* emphasized the importance of the items sought for purposes of determining whether exigency supports a no-knock entry or a shorter wait time after the police announce their presence: "Police seeking a stolen piano may be able to spend more time to make sure they really need the battering ram." *Id.* at 41. The Supreme Court concluded that "after 15 or 20 seconds without a response, police could fairly suspect that cocaine would be gone if they were reticent any longer," noting that cocaine is "easily disposable." *Id.* at 38.

### a.   Violation of a Constitutional Right

Taken in the light most favorable to Plaintiffs, the injured parties, the relevant facts are as follows: Seattle police officers arrived at the Andulan residence sometime after 11:00 p.m., announced their presence, waited two seconds at most, and entered the Andulan residence by force.[2] Dkt. 18-2, Exh. 4 at 32; Dkt. 18-3, Exh. 7 at 19; Dkt. 27 at 2. The two seconds that elapsed were not significant enough to support an inference that the Andulans were refusing to answer the door and were not enough to create exigent circumstances justifying an unannounced entry. *See Granville*, 222 F.3d at 1217.

Similarly, exigent circumstances known to the officers before the police announced their presence and before the search was conducted did not justify an unannounced entry. Sergeant Dyment suspected a large marijuana grow operation. Dkt. 21 at 2 ("The odor of marijuana was again very strong - stronger than I have ever smelled in an exterior sniff."). Based upon his experiences, Sergeant Dyment was concerned that

---

[2] Sergeant Brotherton's role in the search is particularly unclear. *See* Dkt. 22 at 4 (Officer Fox believes that Sergeant Brotherton remained outside during the service and execution of the search warrant.); Dkt. 29, Exh. 1 at 26 (At his deposition, Sergeant Dyment could not recall whether Sergeant Brotherton entered the house and testified that, so far as he knew, all members of the entry team entered the house.); Dkt. 21 at 5 ("Sergeant Brotherton was in charge of the containment team, which was to wait outside to make sure no one escaped and to provide back up [sic] to the officers inside."); Dkt. 29, Exh. 1 at 7-8 (Sergeant Brotherton was the assistant team leader.). Viewing these conflicting accounts in the light most favorable to Plaintiffs, the Court assumes for purposes of this analysis that Sergeant Brotherton did enter the residence.

1    the Andulan residence might be linked to several other houses that might be alerted to the

2    search if the occupants of the Andulan residence were given too much time to grant the

3    police entry. *See* Dkt. 31-2, Exh. 1 at 5-6.

4          While this suspicion was not based merely upon generalizations about narcotics, it

5    was based upon generalizations about large marijuana grow operations and was not

6    tailored to the particular circumstances presented. *See id.* at 1319. Generalizations that

7    large marijuana grow operations typically involve more than one house, even when

8    coupled with Sergeant Dyment's detection of a strong marijuana odor, do not create

9    reasonable suspicion that an announced presence would be dangerous or futile, or that it

10   would inhibit the effective investigation of the crime investigation. The Court therefore

11   concludes that Plaintiffs have successfully alleged a Fourth Amendment violation for the

12   manner in which the search warrant was served and executed.

13                     **b.      Clearly Established**

14         At the second step of the qualified immunity analysis, the Court inquires whether

15   the constitutional right at issue was clearly established at the time of the search, either

16   because Defendants' conduct was previously held unlawful or because the unlawfulness

17   is apparent. *See Anderson*, 483 U.S. at 640. The Court concludes that the right to be free

18   from an unannounced entry pursuant to a search warrant under the particular

19   circumstances here (Sergeant Dyment's determination that the strong odor indicated a

20   large grow operation and his knowledge that large grow operations typically involve more

21   than one house) is not clearly established.

22         It is clear from the authority cited by Plaintiffs that an unannounced search cannot

23   be justified on generalizations about drug dealers. *See, e.g.*, *Richards*, 520 U.S. at 391;

24   *Granville*, 222 F.3d at 1219. This case involves more than mere generalizations about

25   drug dealers as a whole. The decision to authorize a dynamic entry was based upon

26   circumstances particular to the Andulan residence (the strong marijuana odor) and to

27   large marijuana grow operations. This level of particularity, while it does not rise to the

28

1  level of a reasonable suspicion, is not obviously unlawful such that the Plaintiffs' asserted
2  right was clearly established.

3        **c.**    **Reasonableness**

4       Having determined that the Plaintiffs' asserted right to be free from an
5  unannounced entry under the circumstances presented here was not clearly established,
6  the Court need not reach the question of reasonableness. Even if the constitutional right at
7  issue in the instant case were clearly established, the Court concludes that a reasonable
8  officer could have believed that Defendants' conduct was lawful. *See Romero*, 931 F.2d
9  at 627.

10       As the Court has noted, the police officers knew that there were indications that
11  the Andulan residence housed a large marijuana grow operation. The police officers knew
12  that large marijuana grow operations typically involve more than one location and
13  believed that announcing their presence would hinder their investigation of other
14  locations linked to the Andulan residence. The police officers did not know precisely who
15  would be in the Andulan residence at the time of the search. Similarly, they did not know
16  whether any occupants would be armed. *But see Baldwin v. Placer County*, 418 F.3d 966,
17  968-69 (9th Cir. 2005) (exigency, if any, did not justify batteries of residents where
18  officers had stated no belief that the plaintiffs would be armed, did not list weapons as
19  property expected to be found, and did not mention a criminal history or conspiracy that
20  would have justified such a belief). Moreover, the search warrant authorized the seizure
21  of weapons. Dkt. 18-2, Exh. 7 at 27. In light of the information known, and unknown, to
22  Defendants, the Court concludes that a reasonable officer could have believed that an
23  unannounced entry was lawful.

24        **d.**    **Conclusion**

25       For the reasons stated above, the Court concludes that Plaintiffs have successfully
26  alleged a violation of their constitutional right to be free from unreasonable searches and
27  seizures. The Court further concludes that the particulars of the right asserted were not

28

ORDER - 13

1   clearly defined and established and that if such right had been clearly established, a

2   reasonable officer could have concluded that Sergeants Dyment and Brotherton acted

3   lawfully. The Court therefore denies Plaintiffs' Motion for Partial Summary Judgment

4   (Dkt. 17) and grants Defendants' countermotion (Dkt. 19) in this respect. Having

5   determined that qualified immunity applies under the facts alleged by Plaintiffs, the Court

6   does not address whether qualified immunity would attach under the facts alleged by

7   Defendants or Plaintiffs' contention that such factual assertions are "conveniently

8   defensible." *See* Dkt. 25 at 1.

9          **2.**    **Unnecessary Damage to Doorway**

10         When serving a search warrant, police may damage the premises "so far as

11   necessary for a no-knock entrance" if they have a reasonable suspicion of exigent

12   circumstances. *Banks*, 540 U.S. 31, 37. The Court having already determined that

13   Sergeants Brotherton and Dyment are entitled to qualified immunity as to the

14   unannounced entry, the Court's inquiry is whether Plaintiffs state a constitutional

15   violation for damaging their premises more than was necessary.

16         Plaintiffs allege the following damage to the residence: removal of a closet door,

17   damage to the front door, deadbolt, and surrounding wood, damage to a light cover on

18   Plaintiffs' car, and damage to a vinyl wardrobe. Dkt. 18-2, Exh. 4 at 34. These allegations

19   do not rise to the level of a constitutional violation. *But see Mena v. City of Simi Valley*,

20   226 F.3d 1031, 1041 (9th Cir. 2000) (affirming denial of qualified immunity where

21   plaintiff testified that officers broke unlocked and open doors and an officer said, "I like

22   to destroy these kind of materials, it's cool."). The Court therefore concludes that

23   Plaintiffs have failed to allege violation of a constitutional right with respect to the

24   damage caused during the search of their residence and are therefore entitled to qualified

25   immunity. Accordingly, the Court denies Plaintiffs' Motion for Partial Summary

26   Judgment (Dkt. 17) and grants Defendants' countermotion (Dkt. 19) in this respect.

27

28

### 3.     Excessive Force

Excessive force claims are analyzed under the Fourth Amendment objective reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 394-95 (1989). Reasonableness depends upon the following factors and the totality of the circumstances: the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.*; *Fikes v. Cleghorn*, 47 F.3d 1011, 1014 (9th Cir. 1995). Courts use "the perspective of a reasonable officer on the scene, rather than [] the 20/20 vision of hindsight" and make "allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

As a threshold matter, the Court notes that the extent to which Sergeants Dyment and Brotherton participated in the alleged use of force against Plaintiffs is unclear because Plaintiffs generally do not distinguish between Sergeants Brotherton and Dyment. *But see* Dkt. 20 at 4 (Officer Franklin Pablocki did not see Sergeants Dyment or Brotherton touch either Plaintiff.); Dkt. 21 at 10 (Sergeant Dyment contends that he did not touch either Plaintiff and did not see Sergeant Brotherton do so.); Dkt. 22 at 4 (Officer P.J. Fox did not see Sergeants Dyment or Brotherton touch Plaintiffs.).

Plaintiffs' theory is that Sergeant Dyment was the team leader and is therefore liable, as a supervisor, for the actions of the other officers.[3] Dkt. 27 at 2 (Mr. Andulan contends that all of the officers must have witnessed the use of force against him, all officers were acting in a similar manner, and no officer told the others not to point their weapons at Plaintiffs).

---

[3] Plaintiffs do not appear to allege that Sergeant Brotherton is liable for the allegedly excessive use of force inside the home. *See* Dkt. 25 at 12 ("The evidence here is thus more than sufficient to make Sgt. Brotherton liable for the unreasonably entry into the Andulan's [sic] home, and Sgt. Dyment liable for both the entry and the actions of his subordinate officers inside.").

1   In assessing whether Sergeant Dyment is entitled to qualified immunity for

2   Plaintiffs' excessive force claims, the Court first analyzes whether qualified immunity is

3   proper as to the type and amount of force used and second as to Sergeant Dyment's

4   supervisory responsibility.

5                    **a.    Use of Force**

6        Plaintiffs allege that Mr. Andulan was forced to the ground at gunpoint, dragged

7   across the floor, and stripped of his sweat pants in the process of being dragged. Dkt. 17

8   at 20. Plaintiffs allege that Ms. Andulan was clearly unarmed when she emerged from her

9   bedroom but was ordered to crawl toward the officers at gunpoint. Plaintiffs do not allege

10  that Sergeant Dyment participated in these actions; rather, they contend that Sergeant

11  Dyment "supervised and led" the officers whose force was unreasonable and excessive.

12  Dkt. 17 at 22.

13        In the context of searches for evidence of narcotics, the Supreme Court has held

14  that officers executing a search warrant for contraband have categorical authority to

15  detain the occupants of the premises while conducting a proper search because the

16  intrusion is slight while the justifications for detention are substantial. The Supreme

17  Court has recognized at least three law enforcement interests as providing substantial

18  justification for detaining occupants during a search: preventing flight in the event that

19  the search uncovers incriminating evidence, officer safety, and orderly completion of the

20  search. *Muehler v. Mena*, 544 U.S. 93, 125 (2005). To accomplish these interests, law

21  enforcement officers may take reasonable steps to secure the premises. *Los Angeles*

22  *County, California v. Rettele*, 127 S. Ct. 1989, 1992 (2007). The use of handcuffs during

23  the execution of a warrant to search for evidence is permissible, but only when justified

24  by the totality of the circumstances. *Meredith v. Erath*, 342 F.3d 1057, 1062-63 (9th Cir.

25  2003).

26        Efforts to secure the premises may be deemed unreasonable if the use of force is

27  "unnecessarily painful, degrading, or prolonged, or if it involves an undue invasion of

28

ORDER - 16

1 privacy." *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994). In addition, the Ninth

2 Circuit has recognized the general principle that pointing a gun at an apparently unarmed

3 suspect may violate the Fourth Amendment. *Robinson v. Solano County*, 278 F.3d 1007,

4 1015 (9th Cir. 2002) (en banc).

5       Mr. Andulan has successfully alleged an excessive force claim. Taken in the light

6 most favorable to Plaintiffs, Mr. Andulan's allegation that he was dragged across the

7 floor and, in the process, stripped of his sweat pants is sufficient to demonstrate that the

8 officers' actions in handcuffing Mr. Andulan were unnecessarily painful and degrading

9 because Defendants offer no justification for this particular use of force.

10       The Court concludes that Ms. Andulan has also successfully alleged a

11 constitutional violation for excessive use of force. Ms. Andulan contends that because she

12 was unarmed when she emerged from her bedroom, the officers should not have

13 threatened to shoot her. Dkt. 17 at 21. Defendants attempt to analogize the circumstances

14 surrounding Ms. Andulan with those in *Rettele*. In *Rettele*, the Supreme Court held that

15 plaintiffs who were forced to stand naked at gunpoint while police officers searched the

16 room to ensure that there were no other people or dangers failed to allege violation of a

17 constitutional right because the officers acted reasonably and there was no evidence that

18 the detention was prolonged. *Rettele*, 127 S. Ct. at 1993. *Rettele* is of limited assistance

19 because the police in that case did not, as Ms. Andulan alleges here, threaten to open fire

20 on the plaintiffs.

21       The Court concludes that the unlawfulness of dragging Mr. Andulan, thereby

22 causing his sweat pants to fall down, and threatening to shoot Ms. Andulan is apparent

23 such that the right asserted by Plaintiffs was clearly established.

24       The Court's consideration of this aspect of the qualified immunity analysis is

25 somewhat hindered by the lack of differentiation among the officers involved. It is

26 unclear which officers dragged Mr. Andulan and threatened to shoot Ms. Andulan. At this

27 juncture, there is nothing in the record to indicate that Mr. Andulan was defiant or

28

1   threatening to flee such that dragging Mr. Andulan could constitute a reasonable measure

2   to effectuate the search. Because Ms. Andulan concedes that she proceeded down the

3   hallway of her own accord and was confused, the Court cannot determine as a matter of

4   law that no reasonable officer could have thought it necessary to threaten to shoot Ms.

5   Andulan in order to secure the premises and conduct the search. The Court therefore

6   concludes that under the facts alleged by Plaintiffs, the officers are not entitled to

7   qualified immunity, and Defendants' countermotion should be denied. Because the

8   qualified immunity analysis is heavily dependent on facts, however, further development

9   of the record may reveal facts justifying qualified immunity. The Court therefore denies

10   Plaintiffs' motion in this respect.

11   **b.   Supervisory Responsibility**

12   In limited circumstances, a person can be subject to liability under Section 1983

13   for the acts of others. *Hydrick v. Hunter*, 500 F.3d 978, 988 (9th Cir. 2007). Supervisors

14   can be held liable for their own action or inaction in the training, supervision, or control

15   of subordinates, acquiescence in subordinates' unconstitutional conduct, or for conduct

16   displaying "reckless or callous indifference to the rights of others." *Cunningham v. Gates*,

17   229 F.3d 1271, 1292 (9th Cir. 2000). While there is no respondeat superior liability under

18   Section 1983, a supervisor may be held responsible for the constitutional violations of

19   subordinates if the supervisor (1) participated in, (2) directed, or (3) knew of the

20   violations and failed to prevent the unconstitutional conduct. *Id.*; *Taylor v. List*, 880 F.2d

21   1040, 1045 (9th Cir. 1989); *see also Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)

22   ("A person 'subjects' another to the deprivation of a constitutional right, within the

23   meaning of section 1983, if he does an affirmative act, participates in another's

24   affirmative acts, or omits to perform an act which he is legally required to do that causes

25   the deprivation."). Police officers have a duty to intercede when their fellow officers

26   violate the constitutional rights of a suspect or citizen if they have a "realistic

27   opportunity" to intercede. *Cunningham*, 229 F.3d at 1290-91. Liability under Section

28

1983 can also be premised on actions "setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Johnson*, 588 F.2d at 743-44. The supervisor's actions must be the proximate cause of the constitutional rights violation. *Redman v. County of San Diego*, 942 F.2d 1435, 1447 (9th Cir. 1991).

Sergeant Dyment's knowledge of and acquiescence in the actions against Plaintiffs are issues of fact that preclude a definitive qualified immunity ruling at this juncture. Taken in the light most favorable to Plaintiffs, Sergeant Dyment was inside the residence during the search and was in a position to witness the use of force against Mr. Andulan but did nothing to stop it. Dkt. 27 at 2. While these allegations are sufficient to state an excessive force claim based on Sergeant Dyment's supervisory authority, the scant factual record pertaining to this claim counsels against a definitive qualified immunity ruling at this juncture. The Court therefore denies Plaintiffs' Motion for Partial Summary Judgment (Dkt. 17) and denies Defendants' countermotion (Dkt. 19) in this respect.

## IV. ORDER

Therefore, it is hereby

**ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (Dkt. 17) is **DENIED**, and Defendants' countermotion (Dkt. 19) is **GRANTED** as to Plaintiffs' unreasonable search claim and **DENIED** as to Plaintiffs' excessive force claim.

DATED this 21st day of March, 2008.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE

ORDER - 19